[Crim. No. 3267.   Second Appellate District, Division One.—February 16, 1940.]

THE PEOPLE, Respondent, v. GEORGE DONNER LATHROP et al., Defendants; LOUIS M. MEAD, Appellant.

Vernon R. Hamilton for Appellant.

Earl Warren, Attorney-General, and R. S. McLaughlin, Deputy Attorney-General, for Respondent.

YORK, P. J.—The defendants were charged jointly with the crime of grand theft and upon a jury trial were found guilty as charged. Defendant Mead alone prosecutes this appeal from the "conviction, judgment and sentence imposed upon" him, upon the grounds that (1) the evidence is insufficient to support the verdict; (2) the trial court erred in restricting him upon cross-examination as to the question of value of the property alleged to have been taken; and (3) the court erred in refusing to give certain instructions requested by appellant.

A review of the evidence adduced at the trial reveals that around the hour of 11:20 o'clock on the evening of March 23, 1939, Deputy Sheriff Reid responding to a call arrived at the corner of Pico-Coffman Road and Whittier Boulevard in the county of Los Angeles, where he found an abandoned Studebaker sedan loaded with oil well equipment described as tool joints and couplings. Apparently the automobile had broken down under the weight of the load, because the tires on the rear wheels were off and the rims flattened out. The officer parked his car a short distance away and about an hour later he observed a Ford truck drive up and stop beside the Studebaker; upon approaching the same he found that defendant Lathrop was driving the truck and defendant Summers and appellant Mead were standing near the Studebaker. When questioned by the said officer, appellant gave his name, stated that he owned the Studebaker, but denied that he knew anything about the theft of the oil well equipment, although he admitted that he had been with the two defendants and had helped them load the equipment into his car. In the presence of appellant, defendant Lathrop

told Officer Reid that they had stolen the equipment, and defendant Summers admitted that he had helped to steal it. In company with Lathrop and two other deputy sheriffs, Officer Reid traced the rim marks of the Studebaker into a gas station at the corner of Durfee Road and Whittier Boulevard, from the gas station to Passons Boulevard, and south thereon about a mile when the tracks disappeared. From that point Officer Reid drove under the direction of defendant Lathrop to the corner of Butler Road and Santa Fe Springs Road and into a field near the Union Oil Company yards, where he observed ''the grass all tramped down and the ground cut up with something, I don't know what, a fresh disturbance of the earth. There was a five or six-foot wire fence there, a cattle fence construction, which was bent slightly out, where various types of couplings were stacked on the inside of the fence, . . . We returned to the station, ordered the truck and Studebaker car and its contents impounded in the Golden State Garage in Norwalk . . . We went back in the station again and talked to both Summers and Mead again, and still Mead denied that he knew the material had been stolen. Summers admitted the fact that he knew it was being stolen. . . . He said he was with the boys when they stole the material and that he knew it was being stolen. Q. Was Mead present at that time? A. He was. He still denied it. Q. What did he say? A. He says, 'The car was mine, and I was with them, but I didn't know it was being stolen. . . . The Court: Mr. Reid, I am not quite clear as to an expression you used. Did you mean Mr. Mead said he was there when the oil fittings were taken, but did not know they were being stolen? A. Yes, your Honor, that is the statement. . . . He didn't deny—he didn't deny that he had stolen it; he denied that he knew it was being stolen, but he was there with the boys and he owned the car.''

Officer Shafer testified that he questioned defendant Lathrop (without the presence of the other two men) and he said ''they went down to Santa Fe Springs, went in the yard at Santa Fe Springs and throwed all these tool joints over the fence. . . . I asked him how he came to do this thing, and he said 'I don't know. I was just driving around looking for a place to get some material.' I asked him if he didn't know that was too much to put in an automobile like that,

to put a ton in there, and he said 'There is nearer two tons than there is a ton.' And I asked him why they put so much on. 'Well,' he said, 'they threw it over the fence and the rest of the boys wanted to get it all.' I asked him whose car it was, and he said it was a car that Mead had just bought, or had just contracted for on the same day that they went out after these tool joints. Q. Was anything said at that time about the truck? A. Oh, yes. I asked him where he got the truck and he said after they broke down that the three of them took a bus, went to Los Angeles, went down on South Flower Street where they had the truck parked, got the truck and drove back, going out to their car for the purpose of unloading the material out of the car and into the truck.''

Mr. Todd, general foreman of the Santa Fe Springs warehouse and yards of the Union Oil Company, testified that there is a five-foot wire fence around said yard, in which is kept a great deal of oil well drilling equipment, including several hundred tool joints or couplings, and where they are reconditioned and kept until needed; that upon the morning of March 24, 1939, he observed a number of couplings had been taken from a point in the yard next to the fence. On the opposite side of the fence he ''noticed that there had been tire marks of cars that had been there, and the ground was all chewed up. It was . . . just after a rain, and the ground was soft, and the grass was all trampled down, and the ground had been all chewed up . . . '' He then went to the garage across the street from the sheriff's office at Norwalk, where he saw a Studebaker sedan; that in and near the car he saw a number of couplings which he identified as the property of the Union Oil Company, which had come from his yard; that they had not been removed from the yard by company men; that he then had the couplings removed from the garage and placed in a rack in the company's yard; that there were 98 couplings of various sizes of a value of at least $750. He testified he had never given permission to the defendants or to anyone else to take those couplings from the company's yard. The 98 couplings weighed about 3,860 pounds, and were all usable. Mr. Hausmann, an employee of the Union Oil Company, also identified the couplings as the property of the company.

Appellant took the stand in his own defense and claimed that he did not know the equipment was stolen and that he got it from a place near Huntington Beach. His story as told to the jury was substantially as follows: That he and his two codefendants drove to Huntington Beach on the afternoon of March 23d; that he was not familiar with the streets there; that they finally arrived where these couplings were piled in a field and that there were oil derricks to be seen in the distance; that defendant Lathrop pointed out the couplings and the three men loaded them into appellant's car; that they then started back to Los Angeles, had tire trouble and had to leave the car; that they then came into Los Angeles, got the truck and returned to the car. He denied that he knew the property belonged to the Union Oil Company; denied that he took it from the said company or that he advised or assisted anyone to take it. However, he admitted that he was present and assisted in loading the couplings into his car. This testimony at most created a conflict in the evidence as to whether the car was loaded in a field near Santa Fe Springs or in a field near Huntington Beach.

Appellant contends that there is no direct evidence which connects him in any way with the original taking or carrying away of any of the property from the possession of the Union Oil Company; that if he had any guilty connection with the stolen property it would appear from the evidence that it must have been subsequent to the original theft of the property.

As has heretofore been pointed out, appellant consistently denied that he knew the couplings were stolen or that he advised or assisted anyone to take them. At the same time, he admitted that he was present and helped to load the oil well equipment into his car so that it could be transported to Los Angeles. Under the circumstances, it became a question for the jury to determine which story it should believe, and there is direct and circumstantial evidence of sufficient substantiality to support the verdict of the jury and the judgment of the court.

The court refused to allow appellant upon cross-examination to inquire into the market value of the couplings as junk. This ruling did not constitute error, for the reason that the evidence was to the effect that the couplings

were usable and not junk; therefore, the value of the property as bulk steel or junk became immaterial. In this connection, it should be noted that later in the trial, defendant Lathrop testified that he bought as junk and paid $3 for a carload of couplings.

■ Appellant claims that it was error for the trial court to refuse to give two instructions which appellant requested be given to the jury. A review of all of the instructions given reveals that the jury was fully and fairly informed as to the law involved in the instant cause, and that the subject matter of the requested instructions, which the trial court refused to give, was fully covered by the instructions which were given.

The judgment appealed from is affirmed; the purported appeal from the conviction and sentence is dismissed.

Doran, J., and White, J., concurred.